[Civ. No. 33221.    Second Dist., Div. Five.    Oct. 20, 1969.]

CLEO W. CULLUM, Plaintiff and Respondent, v. HAROLD W. SEIFER, Defendant and Appellant.

**COUNSEL**

Kirtland & Packard, Wallace C. Reed, and Ellis J. Horvitz for Defendant and Appellant.
Howard W. Shelton for Plaintiff and Respondent.

**OPINION**

**STEPHENS, J.**—This action is one for alleged malpractice. The jury verdict was for the defendant. The court granted a motion for new trial. The defendant appealed.

The facts are that plaintiff, Cleo W. Cullum, first consulted defendant, Dr. Harold W. Seifer, on June 10, 1965. Plaintiff had had a considerable number of medical problems for several years, and had received medical attention from other doctors. The record shows that in addition to a hysterectomy in 1962, plaintiff had suffered from diabetes, pancreatitis, gout, gall bladder trouble, hypoglycemia, German measels, and infected teeth. She had been hospitalized some 12 times, the last of which was in May 1965, about two weeks before the June 10 consultation with defendant. In September of 1964, there had been a surgical removal of three lumps in plaintiff's lower jaw or neck. A biopsy of these lumps showed them to be benign. Plaintiff had infected teeth at the time of the 1964 node excisions, and they were not extracted until either the end of October or beginning of November 1965.

Defendant's consultation with plaintiff included the problem of three lumps on the right side of plaintiff's neck. In the recitation of her medical history to defendant, plaintiff stated that several days before visiting him, she had consulted a Dr. Churchill about whether a second biopsy was necessary because of the three new lymph nodes; she recited that Dr. Churchill advised her in the negative; that Dr. Churchill had stated the new swellings could possibly have resulted from her infected teeth; and that he had recommended, "After you have your teeth extracted, upper and lower, and have the dentures, if the nodes persist, then perhaps at that time maybe we ought to start thinking about a biopsy." Defendant was asked by plaintiff if he agreed with Dr. Churchill's medical evaluation of the nodes, and defendant's response was "to forget them." Thereafter, plaintiff's visits to defendant were every two to three weeks, until November 27, 1965. During the interval between the first visit on June 10, 1965, and last visit on November 27, 1965, plaintiff periodically called defendant's attention to the lumps, which had reached the size of walnuts, and were some eight in number, some of which were on the left side. The nodes were not all located on the neck; they appeared by the ear and jaw, as well. The defendant's advice continued to be for plaintiff not to worry about them.

Following the extraction of her teeth in October or November of 1965, plaintiff asked defendant if the lumps should not go away, and he replied that they might never leave. On November 17 or 18, Dr. Churchill was again visited by plaintiff, and Dr. Churchill recommended a biopsy. This information was conveyed to defendant on November 27, 1965, and defendant concurred. The surgery was performed by Dr. Churchill on December 8, 1965. It was found that the nodes were malignant, and that plaintiff was suffering from lymphosarcoma, a malignant condition affecting the entire lymphatic system. Cobalt treatment followed, as well as subsequent further surgery for removal of nodes under plaintiff's left arm and in the right groin area.

Plaintiff's contention of malpractice is grounded on the theory that defendant should have more promptly diagnosed and treated plaintiff, which would have resulted in the arrest and possible cure of the malignant disease.

In granting the motion for new trial on the ground of insufficiency of the evidence to justify the verdict, the court stated its reason: "The weight of the evidence affirmatively shows that the defendant did not exercise the skill, knowledge and care customarily exercised by internists practicing in the area in question, and that defendant was negligent in his observation and treatment of plaintiff, all resulting in damage to her."

█ The first contention of defendant is that the order granting the new trial should be reversed because the reasons set forth in the trial court's order are nothing but a recital of the elements of plaintiff's prima facie case, and are inadequate under Code of Civil Procedure section 657. The case of *Hoover* v. *Emerald,* 265 Cal.App.2d 637, 640-641 [71 Cal.Rptr. 500] completely disposes of this issue, as follows:

"In granting a new trial the court must state the ground and specify the reason therefor. (Code Civ. Proc., § 657.) The minute order in the case at bench expressed both the ground and the reason in a single sentence; the ground was the insufficiency of the evidence to sustain the verdict; and the reason was the insufficiency of the evidence to establish negligence on the part of defendant Emerald. The purpose of the statute is served by inclusion of the ground and reason in one sentence.

"The sufficiency of the statement of the reason for granting the motion is governed by the circumstances in each case. (*Mercer* v. *Perez,* 68 Cal.2d 104, 115 [65 Cal.Rptr. 315, 436 P.2d 315]; *Matlock* v. *Farmers Mercantile Co.,* 258 Cal.App.2d 362, 367 [65 Cal.Rptr. 723]—hearing denied.) The pattern prescribed by the Supreme Court is an order briefly identifying the portion of the record which convinces the judge the jury clearly should have reached a different verdict. (*Mercer* v. *Perez, supra,* 68 Cal.2d 104, 116.) In a personal injury case, where a motion for a new trial upon the ground of the insufficiency of the evidence to sustain the verdict is directed to the issue of liability, an order specifying the reason for granting the motion 'couched in terms of ultimate fact is adequate.' (*Funderburk* v. *General Tel. Co.,* 262 Cal.App.2d 869, 875 [69 Cal.Rptr. 275].) Thus, an order, such as in the instant case, granting a motion by a defendant upon the ground of insufficiency of the evidence to support the verdict for the reason the evidence is insufficient to establish her negligence, complies with the requirements of the statute. (*Funderburk* v. *General Tel. Co., supra,* 262 Cal.App.2d 869; cf. *Matlock* v. *Farmers Mercantile Co., supra,* 258 Cal. App.2d 362, 365-367; see also *Kincaid* v. *Sears, Roebuck & Co.,* 259 Cal. App.2d 733, 739 [66 Cal.Rptr. 915]—hearing denied.)

"The statement of reasons in the instant order was adequate."

"The decision in *McLaughlin* v. *City & County of San Francisco*, 264 Cal.App.2d 310 [70 Cal.Rptr. 782], cited by plaintiff, does not support his position because the circumstances in the cited case differ materially from those at bench."

■ The second contention of defendant is that the evidence is insufficient as a matter of law to support the trial court's order for the reason that there was no evidence that defendant was negligent. While we may disagree with the trial court in its analysis of the testimony, to substitute our judgment for the trial court's judgment is not our prerogative. The question we must answer is whether there was substantial evidence, if believed, to support a verdict in favor of plaintiff. (*Armstrong* v. *Svoboda*, 240 Cal.App.2d 472, 474 [49 Cal.Rptr. 701].)

■ There is a strong conflict in the evidence, but one expert, Dr. Mohler, adequately supplied sufficient supporting testimony to sustain the plaintiff's case. The plaintiff's witness testified that: (1) the conduct of defendant internist was not consistent with the professional skill and knowledge and the usual amount of care exercised by the ordinary internist in the area involved, and that the nodes should have been biopsied more promptly;[1] (2) the biopsy should have been recommended by defendant within a month after initial discovery of the enlarged lymph nodes (which was done some five months later); (3) had the biopsy established malignancy, treatment should have been immediately commenced; that delay would allow the disease to progress and make a cure more difficult; (4) if lymphosarcoma is confined to regional nodes (in this instance, the cervical chain), the outcome is better than where it involves other regional nodes, "as, for example, if it were to spread to the groin or to the armpit."

While the weakest supporting evidence on behalf of plaintiff's case is that respecting proximate causation, there is sufficient evidence to support the court's conclusion:

"THE COURT: What you [plaintiff's attorney] really want to know, I think, is whether it made any difference to have a delay in initiation of therapy.

"MR. SHELTON [plaintiff's attorney]: That's right.

"    .    .    .    .    .    .    .    .    .    .    .    .    .

"THE COURT: . . . . Doctor [Mohler], you have in mind the dates on which the lymph nodes in the neck were first discovered, and then their progress as related in the hypothetical question?

---

[1]Defendant argues that this testimony was founded solely upon an incomplete, hypothetical question. While it is true that the specific statement was in direct response to such a question, the subsequent questioning of the witness, including a rather extended series of questions posed by the trial judge, clearly made applicable the conclusion as it related to the treatment of plaintiff.

"The Witness [Dr. Mohler]: Yes, sir.

"The Court: And that therapy was not initiated until late November of '65; isn't that the evidence?

"The Witness: Yes, sir.

"The Court: What we are interested in knowing is whether or not an earlier initiation of therapy, such as radiation, whether it would have made any difference in the progress of the disease?

"The Witness: Yes, it would.

"The Court: And what difference would it make?

"The Witness: It would allow the disease to progress and it would make the cure of it more difficult.[2]

"The Court: Now, you would have initiated therapy within about a month?

"The Witness: I would have had her get a biopsy to see what therapy would be indicated.

"The Court: But if the biopsy showed that it was malignant, you would then have initiated therapy?

"The Witness: Immediately; yes, sir.

"The Court: Suppose that had been done by September?

"The Witness: Well, then the prognosis would be improved. The earlier the treatment is begun— The prognosis would be worsened by delay.

". . . . . . . . . . . .

"Q. [By plaintiff's attorney]: And is this treatment during this period that you have just mentioned [a five-year surveillance period], is that related to the delay that we have been discussing here?

"A [By Dr. Mohler]: If lymphosarcoma is confined to one group of regional nodes—in this case the cervical chain—then the outcome is better than if it involves other regional nodes, as, for example, if it were to spread to the groin or to the armpit. If you can attack lymphosarcoma when it is first beginning and is confined to one place, then the prognosis is improved. *So, you would have to assume that a delay would make her need more treatment.* [Italics ours.]

"Is that what you meant?

"Q. That is what I am asking.

"And she did have this spread to the right groin and into the left [axilla], is that right?

---

[2]A reading of the response to the question shows a misunderstanding of the question by the witness, but when we consider the prior question of the court, it is clear that the witness sought to fully answer that question, and so understood the intervening one.

"MR. REED [Defendant's attorney]: That is leading and suggestive, Your Honor.

"MR. SHELTON: Let me withdraw it.

"THE COURT: Did it do that?

"THE WITNESS: Did the delay do that?

"THE COURT: No. Did the lymphosarcoma?

"THE WITNESS: Oh, yes. It did spread.

"Q BY MR. SHELTON: And what is the relationship, if any, to the spread to the groin and the left [axilla], to the delay?

"MR. REED: Again, it assumes that there is some, Your Honor.

"THE COURT: There is some what?

"MR. REED: Relationship between the delay.

"THE COURT: Well, is there any relationship?

"THE WITNESS: Well, you can't say for certain that it had not already spread there because before the nodes are enlarged and it is clinically evident, the disease may be elsewhere. It is conjecture."

From the totality of Dr. Mohler's testimony as it relates to proximate cause, we conclude that with respect to the lymphosarcomatous condition of plaintiff, Dr. Mohler was able to say with reasonable medical probability that the disease had not affected other lymph areas prior to June 10, 1965, and that "a delay would make her need more treatment." The fact is that in this case, evidence of delay in treatment is a failure to conform to the standard of care in the community. The delay itself prevented more certain proof by plaintiff that had treatment been instituted sooner, her disease *would* have been arrested or cured. It seems only reasonable to find that an inference may be drawn that plaintiff and her condition fell within that group wherein prompt treatment would have "confined [her disease] to one place" and "improved the prognosis." The isolated characterization of "conjecture" must be weighed as to its true meaning and significance in the light of the testimony which preceded it. As was stated in *Bauman* v. *City & County of San Francisco,* 42 Cal.App.2d 144 at pp. 164-165 [108 P.2d 989]: " 'But, as stated in *Ballard* v. *Kansas City,* 110 Mo.App. 391 [86 S.W. 479], ' "the main object is not to draw fine distinctions based upon accurate definitions or words, but to ascertain the real idea expressed." ' (See, also, *Block* v. *Milwaukee St. Ry. Co.,* 89 Wis. 371 [61 N.W. 1101, 46 Am. St. Rep. 849, 27 L. R. A. 365].) It is often impossible to show by positive proof whether or not an impairment of health or faculties will follow as a result of injury. Hence, of necessity, in determining the question courts and juries must rely upon the testimony of properly qualified physicians for such testimony as will in the minds of the jury establish the fact in issue to a reasonable certainty. Such evidence must be clearly distinguished from conjecture, or that which merely establishes a possibility of future trouble. As

a rule, the physician whose opinion is most reliable is loath to give an opinion as to what consequences will or will not follow as a result of an injury in a certain case, but at the same time willing, as here, to state the result of his own professional experience and observations in treating cases where like injuries have occurred, and as a result of that experience say that we might or might not expect like results to follow in this case.' "

In addition to Dr. Mohler's testimony, we discern from the record other supportive evidence of proximate cause of damage to the plaintiff. This evidence was not pleasant medical information for plaintiff, but it nevertheless establishes damage to her brought about by the delay, even if the disease had already spread throughout her body, spelling fatality. Dr. Wandling, a defense witness, testified that if a lymph node in a given area of the body swells because of lymphosarcoma and the cause is known, "the patient will do better on radiation" if it's localized, with no other evidence of spread. He testified that treatment of lymphosarcoma alleviates for awhile needless suffering by the patient, and makes survival more comfortable; that delay in treatment of the disease does "not in every case" allow the progress of the lymphosarcoma, for the disease is one "that can remain dormant for a long period of time." The doctor explained that "If you are treating a particular area of enlargement of nodes . . . [t]his does not mean that you cannot have another area of disease of involvement that remains dormant"; that the cobalt treatment of the neck nodes caused typical regression and stopped, at least temporarily, the progression in the case treated; that the radiation "destroy[s] [the cancer cells'] growth processes, their reproductive processes, therefore, allowing the body to take over and have a better defense against the . . . cancerous process"; and that this form of cancer is more sensitive to radiation that some other forms, and [treatment] helps the patient. This witness also testified that the behavior of this disease was uncertain, and that an early attack upon the disease provides, "within reason," a better control of it. He explained what he meant by "within reason'" by stating that "you would not let something spread to every node in the body or every node in the body become involved." He denied, however, that early local treatment could prevent metastasizing of the disease, apparently because it is a systemic one.

Dr. Churchill, also a witness for the defense, testified that, "I know that many people have lived more comfortably [as a result of treatment of this disease.]" In answer to the question, "And if you render treatment to a patient with lymphosarcoma, you favor the chance of their surviving for a longer period, don't you," Dr. Churchill replied, "We hope that they will survive for a longer period. Yes; we favor that." Also, he confirmed that, though he professed conformance by the defendant to the community standard of care, "I would have liked to have seen it [the biopsy] done sooner.'"

We cannot narrowly construe the testimony relative to early prognosis

and prompt treatment. We observe testimony throughout the record (some of which has been hereinbefore referred to) which, if believed, would support the inference that it is a reasonable medical probability that the plaintiff would have been benefited, i.e.! by possible lengthening of her life and/or her personal comfort—even if no cure would have resulted from more prompt diagnosis and treatment. These are matters of injury proximately caused by the delay, and support the granting of a new trial.[3]

The order is affirmed.

Kaus, P. J., and Aiso, J., concurred.

---

[3]Plaintiff has died during the pendency of this appeal. While some measures of damage are no longer in issue, this does not render the litigation moot. (*Love* v. *Wolf*, 249 Cal.App.2d 822, 839-841 [58 Cal.Rptr. 42].)