Filed 7/25/23  Edwards-Behar v. Dobry CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| TATYANA A. EDWARDS-BEHAR, | D080420 |
| Plaintiff and Appellant, |  |
| v. | (Super. Ct. No. 37-2019-00064332-CU-MM-CTL) |
| MARY M. DOBRY, |  |
| Defendant and Respondent. |  |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Affirmed.

Bove Law Group and Brook Leone Bove for Plaintiff and Appellant.

LaFollett, Johnson, DeHaas, Fesler & Ames and James J. Wallace II; Cole Pedroza and Kenneth R. Pedroza, Nicole F. DeVanon for Defendant and Respondent.

Tatyana Edwards-Behar (Edwards) appeals a summary judgment in favor of respondent Mary Dobry, M.D. on Edwards's complaint for medical malpractice based on alleged delay in diagnosing melanoma.  We affirm.

FACTUAL AND PROCEDURAL HISTORY

The undisputed facts show that on February 26, 2018, Edwards consulted with Dr. Dobry concerning a lesion on her right upper arm. Dr. Dobry's notes indicated Edwards had multiple lesions. On August 23, 2018, Edwards returned to Dr. Dobry for a consultation. Dr. Dobry did not perform a biopsy of Edwards's lesions on either of those visits.[1] During a December 2018 visit, Dr. Dobry noticed a lesion on Edwards's right arm had changed, and ordered a biopsy, which confirmed a diagnosis of malignant melanoma.

A January 2019 nuclear medicine test revealed intense activity with at least three distinct foci in Edwards's right axilla. After a further biopsy, one of Edwards's lymph nodes tested positive for metastatic melanoma. In January 2019, Edwards began a year-long immunotherapy treatment. The following month, an oncologist determined she had stage 3 melanoma that had metastasized to her lymph node. After six months of treatment, an ultrasound of Edwards's right upper arm detected no abnormal lymph nodes.

*Edwards's Complaint*

Edwards sued Dr. Dobry, alleging a single cause of action for medical malpractice. She claims Dr. Dobry "so negligently and carelessly examined, diagnosed, cared for, treated and rendered medical services upon the person

---

[1]    The parties dispute Edwards's purpose in making those two 2018 visits to Dr. Dobry's office, with Dr. Dobry claiming Edwards sought Botox treatment in the first visit, and that although Edwards had numerous lesions, there were no signs of skin cancer. Edwards claims that during both visits she specifically requested a biopsy of a lesion on her upper right arm. We examine the evidence independently, and "our account of the facts is presented in the light most favorable to the nonmoving party below, in this case [Edwards], and assumes that, for purposes of our analysis, her version of all disputed facts is the correct one." (*Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 999; accord, *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 470.)

2

and body of [Edwards] . . . that as a direct and proximate result thereof, [Edwards] was caused to and did suffer" injuries. Edwards specifically claims she "was injured in her health, strength and activity, sustaining severe shock and injury to her nervous system and person, causing her mental, physical and nervous pain and suffering and resulting in disability all to her damage."

*Dr. Dobry's Motion for Summary Judgment*

Dr. Dobry moved for summary judgment on grounds her treatment of Edwards was within the applicable standard of care, and she did not cause any of Edwards's injuries. Dr. Dobry submitted two medical experts' declarations. Adam Rotunda, M.D., a dermatologist, reviewed Dr. Dobry's medical records of Edwards and noted Edwards had a history of visits with Dr. Dobry from as early as 2011. He said that at each visit, Dr. Dobry indicated Edwards had "numerous precancerous lesions . . . located on her trunk and extremities, which were treated with liquid nitrogen or curetted. Of note, on all visits, [Dr. Dobry] specifically noted that [Edwards] did not have any atypical moles or skin cancer." Dr. Rotunda stated that during Edwards's February 2018 and August 2018 visits, Dr. Dobry observed no skin cancers. But after the August 2018 visit, Dr. Dobry advised Edwards "to return in one month for another checkup." Dr. Rotunda added that in December 2018, Dr. Dobry noted Edwards had a right arm lesion that was questionable for cancer. A biopsy performed on that day confirmed melanoma.

Dr. Rotunda affirmed: "Edwards had a significant and long history of sun damage and precancerous lesions examined by and treated by [Dr. Dobry]. Photographs of [Edwards] reveal significant sun damage on her right arm." Dr. Rotunda opined Dr. Dobry's treatment of Edwards "was at all times within the standard of care in the community of dermatologists." He

3

concluded that "Dr. Dobry's visits with [Edwards] every three to six months were appropriate."

Dr. Rotunda opined: "From the pathology reports, I believe that [ ] Edwards's melanoma was very aggressive and based upon the depth, presence of ulceration and the mitotic rate of the melanoma cells[,] I believe that the malignant melanoma lesion diagnosed by Dr. Dobry in December of 2018 was not present during an earlier visit with [Edwards] in August of 2018 and was therefore de novo (new)[.]  This is the most common presentation of melanoma.  Moreover, it is very feasible given the aggressiveness of the lesion pathologically, and the fact that the lesion was only 0.6 [centimeters] on examination (relatively small), that it arose within the [six] months since her last visit.  . . .  [¶]  Moreover, the pathology report by the . . . pathologists did not suggest the presence of any scarring, which would suggest that the biopsy site was previously treated by [Dr. Dobry]."

Edward McClay, M.D., a defense oncology expert, reviewed Dr. Dobry's notes of Edwards's February 2018 visit and stated, "Multiple actinic keratosis[2 ] lesions were noted, including one at the right shoulder, eight on the patient's back, and four on her arms.  The lesion on the right shoulder was curetted to remove it."  Dr. Dobry's notes of Edwards's August 2018 visit state "there were no atypical moles, and there were no signs of skin cancer. There was no indications [*sic*] of lesions suspicious for melanoma.  [Edwards] was advised to return in one month for another checkup.  [She] failed to return in [one] month, in fact delaying her return by [four] months[.]  At this time the lesion on the right [arm] looked markedly different."

---

2      Dr. Rotunda in his declaration states "actinic keratosis" are "precancerous lesions."

Dr. McClay stated that based on the January 2019 nuclear medicine test, "There was metastatic melanoma involving one of the six lymph nodes, however, only [five] malignant cells were identified. Patients with small metastatic lesions (less than or equal to one [millimeter]) such as this, have a survival that is equivalent to similar individuals with no metastasis in the lymph node."

Dr. McClay concluded Dr. Dobry's care and treatment of Edwards "was not the cause of any injuries alleged by [Edwards]." He stated Edwards had a rare type of melanoma that is diagnosed in only approximately 5000 patients a year. He added, "[t]his form of [melanoma] has the appearance of a pimple, typically red in color and frequently does not have the same characteristics of a pigmented melanoma, which is more common."

Dr. McClay opined: "Even if Dr. Dobry had made the melanoma diagnosis four months earlier, in August of 2018 the prognosis would have been the same for [Edwards]. . . . [Her] chance of five-year survival is 65 to 70 percent. Even if the lesion was diagnosed in August of 2018, [Edwards's] prognosis would not be different, and her five-year chance of survival was still greater than 50 percent." Dr. McClay pointed out, "As the CT scans of [Edwards's] chest, abdomen, and pelvis were [unremarkable], there is no evidence of a distant metastases of the melanoma."

*Edwards's Opposition to Summary Judgment*

In opposing the motion, Edwards argued Dr. Dobry's treatment of her fell below the standard of care for dermatologists, and caused her injuries. Edwards submitted her own declaration in which she stated: "The main reason I went to Dr. Dobry on February 26, 2018, was to show her a suspicious lesion on my upper right arm. Suspecting/fearing that it was cancerous, I requested a biopsy. . . . Dr. Dobry told me the suspicious lesion

5

on my upper right arm looked fine—that it looked like a standard keratosis. Dr. Dobry reassured me that it was 'nothing to worry about' and declined to perform a biopsy. Instead, Dr. Dobry curetted and applied liquid nitrogen to the lesion." Edwards stated Dr. Dobry likewise rejected her August 2018 request for a biopsy, but finally performed one in December 2018, when her cancer was diagnosed.

Edwards also submitted declarations of three medical experts. Deede Liu, M.D., a dermatologist, reviewed Edwards's medical records and opined Dr. Dobry should have biopsied Edwards's lesion in February 2018, and the delay in doing so caused the cancer to progress from stage 1 or 2 to stage 3. According to Dr. Liu, the December 2018 biopsy results "demonstrated that the melanoma had a class IIb molecular signature. This finding is associated with of risk of [*sic*] recurrence within [five] years of 54 [percent.]" Dr. Liu opined that Dr. Dobry's failure to biopsy the lesion on that date breached the standard of care.

Richard Buckley, M.D., another dermatology expert, reviewed Edwards's medical records. He opined "Dr. Dobry's negligence in not performing the biopsy on [February 26, 2018,] was a substantial factor in causing harm to [Edwards, who] to a medical certainty would have been [s]tage 1 or 2 if the biopsy had been performed [then] with a [five]-year survival rate of 98 [percent] and now is a [s]tage 3 with a [five]-year survival rate of 63 [percent]."

John Fruehauf, M.D., Edwards's oncology expert, reviewed Edwards's medical records and stated the December 2018 biopsy demonstrated Edwards's melanoma's molecular signature "is associated with a risk of recurrence within [five] years of 54 [percent]." Based on a medical journal article, he concluded that if Dr. Dobry had performed the biopsy in February

6

2018, Edwards's 10-year survival rate would have been 88 percent. However, as Edwards was diagnosed with stage 3C melanoma in January 2019, her 10-year survival rate dropped to 60 percent. Dr. Fruehauf stated Edwards's "most recent scans from January 13, 2021[,] and May 11, 2021[,] were clear of recurrence." Dr. Fruehauf opined that Dr. Dobry's "negligence was a substantial factor in causing harm to [Edwards]. A 10[-]month delay in biopsy of the lesion was significant in terms of tumor progression. If the lesion had been biopsied on [February 26, 2018,] the tumor more likely than not would have been curable and probably a stage 2 or 3."

*Dr. Dobry's Reply*

Dr. Dobry in reply objected to the declarations by Edwards's experts, who relied on Edwards's own declaration, which was not included in the medical records. Dr. Dobry argued Edwards's "experts fail[ed] to identify any specific information contained in the medical records upon which they base their opinions evidencing the disputed fact that [Edwards's] melanoma existed in February or August 2018."[3]

*The Court's Ruling*

Following an unreported hearing, the court granted Dr. Dobry's motion for summary judgment based on Edwards's "inability to prove causation on a 'lost chance' theory as outlined in the case of *Dumas v. Cooney* (1991) 235 Cal.App.3d 1593. [(*Dumas*)]." The court noted triable issues of fact exist regarding the separate question of whether Dr. Dobry met the standard of care, as shown by the parties' opposing expert declarations; nevertheless, it did not base its ruling on that ground.

---

[3]    The court did not rule on Dr. Dobry's evidentiary objections.

DISCUSSION

Edwards contends: "As to the question of causation, [she] raised a material issue of fact . . . , namely that if [Dr. Dobry] had sent the curetted sample to pathology for testing in February 2018, [Edwards's] cancer would have been discovered at an earlier stage than stage 3. . . . The survival rate for stage 2 is approximately 88 [percent] and drops to 60 [percent] for stage 3." She adds that the "trial court's reliance on *Dumas*[, *supra*, 235 Cal.App.3d 1593] is misplaced and the court should have looked at traditional proximate cause." Finally, in arguing the grant of summary judgment was erroneous, Edwards points to differences in the opposing experts' analysis of her melanoma: "The expert evidence that the delay in diagnosis caused ulceration and spreading to the lymph nodes is admissible and should be considered by a jury. The trial court did not rule it inadmissible in any way. Any dispute in that evidence only strengthens the argument that a jury should be allowed to weigh the expert opinions and make a decision as to the facts."

I. *Standard of Review*

We review an order granting summary judgment de novo. (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.) " 'In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment.' " (*Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 504-505; *Hernandez v. KWPH Enterprises* (2004) 116 Cal.App.4th 170, 175 ["The appellate court 'must assume the role of the trial court and redetermine the merits of the motion' using the same standards required below"].)

A defendant seeking summary judgment bears "the burden of persuasion" that one or more elements of the cause of action in question

cannot be established or that there is a complete defense to it. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) The defendant also "bears an initial burden of production to make a prima facie showing" that no triable issue of material fact exists; if he carries his burden of production, "he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*; Code Civ. Proc., § 437c, subds. (o), (p)(2).)

II. *Law on Medical Malpractice and the "Lost Chance" Theory*

" 'The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.' " (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1077.)

"As a general rule, the testimony of an expert witness is required in every professional negligence case to establish . . . whether any negligence by the defendant caused the plaintiff's damages." (*Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1542.) *Dumas* involved a medical malpractice action arising from delayed diagnosis and treatment of lung cancer. There the plaintiff claimed he was entitled to damages for the lost chance of a possible cure, possible lengthening of life or possible improved physical comfort even if the evidence showed less than a probability that the defendant caused such loss. (*Dumas, supra,* 235 Cal.App.3d at pp. 1607-1610.)

The *Dumas* court addressed "the theory of lost chance, a theory heretofore unrecognized in California that permits recovery even though the

9

evidence shows no more than a better-than-even chance that a defendant caused a plaintiff's loss." (*Dumas, supra,* 235 Cal.App.3d at pp. 1600-1601.) The court elaborated: "Liability for medical malpractice is predicated upon a proximate causal connection between the negligent conduct and the resulting injury. [Citation.] '[C]ausation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. [Citations.] That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury.' " (*Dumas, supra,* at p. 1603.)

The *Dumas* court declined "to establish a more lenient standard of causation in medical malpractice cases to account for the theory of lost chance." (*Dumas, supra,* 235 Cal.App.3d at p. 1608.) Instead, it held the traditional rule of causation applies in delayed diagnosis cases, such that the evidence must establish a probability of a better result absent negligence. (*Id.* at p. 1603.)

The *Dumas* court observed that the lost chance theory "is, in reality, focused on causation rather than injury and damages. [¶] A lost chance of survival or a better result cannot be proven unless and until the death or adversity occurs. Otherwise, in the case of a loss proven by statistics alone, a court could be placed in a position of awarding damages without injury, e.g., in the case of a patient who 'miraculously recovers despite the negligence and unfavorable odds.' [Citation.] The true injury in lost chance cases is

10

therefore the death or adversity.  [Citation.]  Thus, 'when we strip away the rhetoric, damages are really being awarded for the *possibility* that the negligence was a cause of the death.'  [Citation.]  Stated another way, '[t]he recognition of a lost chance as a cognizable injury is necessarily based on the reasoning that but for the defendant's negligence, the plaintiff *might possibly* have avoided an adverse result.  Thus, recognition of lost chance as a recoverable interest contradicts the very notion of cause in fact.' " (*Dumas, supra,* 235 Cal.App.3d at pp. 1609-1610.)

### III.  *Analysis*

Edwards claims "the trial court's reliance on *Dumas* was prejudicial error because the 'lost chance' theory of causation is inapplicable where she can and did assert a theory of traditional proximate cause."  (Some capitalization and emphasis omitted.)  But Edwards in effect relies on the lost cause theory of causation because, based on the declaration of her expert, Dr. Fruehauf, she argues the issue here is that if Dr. Dobry had detected her cancer earlier, she would have benefitted from the higher survival rate for stage 2 cancer, which is approximately 88 percent; instead, her survival rate dropped to 60 percent as a stage 3 cancer patient.

On this summary judgment record, the only injury Dr. Dobry's delayed diagnosis arguably caused is the increased chance that Edwards will not survive for five years (and in the case of Dr. Fruehauf's declaration, which we credit,10 years).  Under *Dumas*, in order to proceed to trial there must be evidence that it is more likely than not Edwards will not survive for those time periods as a result of the delayed diagnosis.  However, despite the fact the experts disagreed slightly on the precise 5-year survival rate, it is undisputed that Edwards's chance of survival for those periods exceeds 50 percent regardless of whether the cancer was diagnosed in February 2018 or

11

December 2018.  Accordingly, Edwards has not shown within a reasonable medical probability that the delay caused her injury.  She cannot recover merely for the decrease in her survival rate.  This is because California courts have consistently rejected recovery for a lost chance of survival " 'where the evidence indicates that there is less than a probability, i.e., a 50-50 possibility or a mere chance,' that the injury would have ensued."  (*Duarte v. Zachariah* (1994) 22 Cal.App.4th 1652, 1657-1660, quoting *Dumas, supra,* 235 Cal.App.3d at pp. 1603-1611; see also *Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1505-1506 ["*Dumas* recognized there are countervailing policy arguments which dictate against extending liability to situations where it is not medically probable the physician's negligence caused the harm alleged"]; *Simmons v. West Covina Medical Clinic* (1989) 212 Cal.App.3d 696, 706 ["Under the facts of this case, we decline to establish a more lenient standard of causation.  To do so would be contrary to sound logic, legal precedent, and public policy"].)

Even interpreting Edwards's evidence liberally as we must (*Gonzalez v. Mathis*, *supra,* 12 Cal.5th at p. 39), Edwards has not shown there was a *probability* (versus a mere possibility) of a better result absent any negligence on Dr. Dobry's part.  Accordingly, her claim fails under the traditional rule of causation (*Dumas, supra,* at pp. 1603-1611), and the court did not err in granting summary judgment in Dr. Dobry's favor.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded her costs on appeal.


O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DO, J.