Filed 7/12/24  Simonian v. Badalian CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THEOD SIMONIAN et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>VAHE BADALIAN,<br><br>Defendant and Respondent. | B323737<br><br>(Los Angeles County<br>Super. Ct. No. 20STCV00400) |

APPEAL from a judgment of the Superior Court of Los Angeles County, William A. Crowfoot, Judge.  Reversed.

Shegerian & Associates, Carney R. Shegerian, Anthony Nguyen, Mark Lim, Aadil Muhammad and Iman Alamdari for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza, Cassidy C. Davenport, Matthew S. Levinson; Packer O'Leary & Corson, Robert B. Packer and Hilliary B. Powell for Defendant and Respondent Vahe Badalian.

_____

In a medical malpractice action arising from the death of a post-operative patient in an ICU, the plaintiffs' expert in critical care medicine opined that the decedent's cardiologist fell below the standard of care by failing to order serial hemoglobin monitoring, and had such monitoring been undertaken there would have been enough time to prevent the fatal heart attack he suffered. After finding the expert's opinion to be inadmissible essentially because the expert failed to list the exact cause of death as his particular area of expertise, the trial court granted summary judgment to the defendant. We reverse because nothing in the record suggests an expert in critical care medicine cannot offer an expert opinion on post-operative hemoglobin monitoring and on the result from the failure to monitor.

## BACKGROUND

Razmi Simon, age 76, who suffered from chronic cardiovascular disease, hypertension and hyperlipidemia, was admitted to Glendale Adventist Medical Center requiring immediate surgery for a fractured hip. Dr. Vahe Badalian, Simon's cardiologist and primary care provider, examined Simon at his bedside and contacted Michael Abdulian, a surgeon, who performed surgery on Simon's hip on the morning of November 20, 2018. Simon, who took aspirin and prasugrel as antiplatelet therapy, had a preoperative hemoglobin level of 12.6 grams per deciliter, an amount raising no medical issues. He lost only 50 milliliters of blood during the surgery, not an amount to raise concern of excessive bleeding.

In the evening of November 21, 2018, Simon developed tachycardia and complained about pain in his leg and chest. Dr.

2

Badalian ordered a complete blood count test, which revealed that Simon's hemoglobin had dropped to 6.8 grams per deciliter, reflecting critical perioperative blood loss. An electrocardiogram was ordered, which showed Simon was suffering a heart attack.

Simon was taken to the ICU, where he underwent a series of interventions before dying on the morning of November 23, 2018, from "cardiopulmonary arrest, cardiogenic shock, [and] acute coronary insufficiency secondary to supply demand mismatch."

Lidoosh Akoupian, Theod Simonian, and Arbey Simon, Simon's wife and sons, sued Dr. Badalian for professional negligence, alleging he breached the standard of care by failing to order serial hemoglobin monitoring after Simon's operation. Plaintiffs alleged that failure to monitor Simon's hemoglobin levels caused a failure to detect that he was bleeding internally until it was too late to prevent him from suffering a fatal heart attack. Had Simon's hemoglobin been checked earlier, plaintiffs alleged, his blood loss would have been detected in time to give him a transfusion, which would have prevented his death.

Dr. Badalian moved for summary judgment, supported by the declaration of Fernando Roth, M.D., a cardiologist in private practice and attending faculty member with a Clinical Professor appointment at the Keck USC School of Medicine.

Dr. Roth opined that the standard of care does not require hemoglobin monitoring following orthopedic surgery unless the patient demonstrates signs or symptoms of bleeding, such as hypotension, tachycardia, increased respirations, or frank bleeding. Roth declared that Dr. Badalian appropriately monitored Simon throughout his admission, because his post-operative vitals and clinical presentation were normal and not

3

suggestive of bleeding, and thus there was no indication of the need to measure his hemoglobin levels prior to his complaints.

Roth also declared that no deviation from the standard of care caused or contributed to Simon's death because even if post-operative hemoglobin monitoring had been ordered, the results would not have predicted Simon's sudden myocardial infarction and other associated symptoms. This is so, Roth declared, because there likely would have been no drop in Simon's hemoglobin values which would have prompted intervention, because the infarction was a sudden, acute event caused by a ruptured ulcer or breach of a vessel. Had Simon been experiencing postoperative bleeding for an extended time, Roth declared, he would have exhibited signs or symptoms of such bleeding, such as tachycardia and hypotension, which did not occur.

Plaintiffs opposed the motion, offering the declaration of Kevin Shaw, M.D., an internist, pulmonologist, and critical care specialist currently serving as the Medical Director of the intensive care unit at Scripps Memorial Hospital in Encinitas.

Dr. Shaw declared he "routinely cared for patients with advanced pulmonary diseases, heart transplantation, cardiogenic shock, extracorporeal membranous oxygenation, immunosuppression, massive trauma, septic shock, and the like," and currently worked 15 to 20 shifts per month caring for critically ill patients with a variety of pathologies.

Dr. Shaw declared, "The standard of care in [Simon's] situation would have been serial hemoglobin monitoring in the postoperative setting, with transfusion and potential CT imaging of the thigh with any significant drop in hemoglobin, or pain out of proportion to what would be expected. In the event that the

4

patient's hemoglobin was to drop, immediate transfusion of blood products, with consideration of platelet product transfusion, or potentially an angiographic intervention, would be able to minimize cardiovascular consequences and could have avoided Mr. Simon death."

"Hemorrhagic complications from femur surgery are not uncommon," Dr. Shaw declared, and "can be difficult to detect immediately because the thigh tends to be large, with deep pockets of potential space between muscle and fatty tissue, able to contain a large amount of blood volume before it is clinically apparent with signs such as bruising. As a cardiologist, and as the very prescriber of Mr. Simon's aspirin and prasugrel therapy, Dr. Badalian should have been intimately familiar with the mechanism of action of these medications. Dr. Badalian was clearly aware of the risks of Mr. Simon's dual antiplatelet therapy, as evidenced by his note regarding his prasugrel use."

Dr. Shaw declared that Dr. Badalian fell below the standard of care, by "fail[ing] to appropriately monitor the laboratory values of Mr. Simon. Specifically, [he] failed to follow the patient's hemoglobin values for evidence of perioperative blood loss. Mr. Simon was anticoagulated with dual antiplatelet therapy, including aspirin and prasugrel. Prasugrel is well-known to cause significant hemorrhagic complications in the setting of the surgical procedures. Because of this, it is typically held for 7 days prior to elective surgery. In the setting of emergent surgery, such as the surgery of Mr. Simon, precautions must be taken to ensure minimal risk of hemorrhagic complications. These may include platelet transfusion, frequent physical examination, serial laboratory monitoring, imaging as necessary, and red blood cell transfusion."

5

Dr. Shaw declared, "A patient such as Mr. Simon, who is known to have severe cardiovascular disease with multiple previous interventions, is prone to myocardial ischemia with any significant hemorrhagic episode. This . . . should have . . . been well-understood by his cardiologist and primary physician."

Dr. Shaw declared that by failing to meet the standard of care, Dr. Badalian "allowed Mr. Simon's hemoglobin to drop far below what would be reasonable. This led to his acute coronary syndrome, chest pain, respiratory failure, vital sign abnormalities, and subsequently a cascade of ill-advised interventions. This failure to meet the standard of care, as well as Dr. Badalian's prompting to pursue left heart catheterization and heparin anticoagulation, resulted in Mr. Razmi Simon developing respiratory failure, intubation, cardiogenic shock, renal failure, and death. [¶] It is my opinion that had Dr. Badalian . . . monitored the patient's hemoglobin in a fashion consistent with the standard of care, Mr. Simon would have survived his surgery and his hospitalization, and would have been discharged back home to his family."

Dr. Badalian objected to Shaw's declaration on the ground that it lacked foundation because he failed to explain how his training qualified him to opine on the standard of care appliable to a cardiologist.

The trial court sustained the objection. It found that although "Dr. Shaw demonstrate[d] that he has experience in caring for patients with advanced pulmonary diseases, heart transplantation, cardiogenic shock, extracorporeal membranous oxygenation, immunosuppression, massive trauma, and septic shock," "there is no evidence that Decedent's death was caused by any of these."

6

The court found that because Dr. Shaw's declaration was inadmissible, plaintiffs failed to rebut Dr. Roth's opinion that Dr. Badalian complied with the applicable standard of care. The court therefore found no triable issue existed as to Dr. Badalian's breach of the standard of care, and granted summary judgment.

Plaintiffs appeal from the resulting entry of judgment.

## DISCUSSION

Plaintiffs contend the trial court abused its discretion in finding Dr. Shaw's declaration to be inadmissible, and had it been admitted it would have established that triable issues exist as to Dr. Badalian's breach of the standard of care and causation. Consequently, plaintiffs argue, the court erred in granting summary judgment. Dr. Badalian counters that the declaration was inadmissible, but even had it been admitted it failed to establish a triable issue as to either breach or causation. We agree with plaintiffs.

## A. Legal Principles

### 1. Professional Negligence

The elements of a cause of action for medical professional negligence are: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122.)

"[T]he causation inquiry has two facets: whether the defendant's conduct was the 'cause in fact' of the injury; and, if so, whether as a matter of social policy the defendant should be held legally responsible for the injury." (*Osborn v. Irwin*

7

*Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 252.)  To determine causation in fact, California has adopted the substantial factor test set forth in the Restatement Second of Torts, section 431.  (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052; Rest.2d. Torts, § 431 [negligent conduct is a legal cause of harm if it is a substantial factor in bringing about the harm].)  An event will be considered a substantial factor in bringing about harm if it is "recognizable as having an appreciable effect in bringing it about."  (Rest.2d Torts, § 433, com. (d).)

In a medical negligence case, " 'causation must be proven within a reasonable medical probability based upon competent expert testimony.  Mere possibility alone is insufficient to establish a prima facie case.' "  (*Dumas v. Cooney* (1991) 235 Cal.App.3d 1593, 1603.)

### 2. Expert Testimony

Because the standard of care in a medical malpractice case is a matter "peculiarly within the knowledge of experts" (*Sinz v. Owens* (1949) 33 Cal.2d 749, 753), expert testimony is required to "prove or disprove that the defendant performed in accordance with the standard of care" unless the negligence is obvious to a layperson (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305; *Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 523).

A person is qualified to testify as an expert if he has "special knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on "the subject to which his testimony relates."  (Evid. Code, § 801, subd. (b).)  Expert opinion testimony must be "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type

8

that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (*Ibid.*)

"A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." (Evid. Code, § 802.)

"[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772 (*Sargon*).)

"In order to testify as an expert in a medical malpractice case, a person must have enough knowledge, learning and skill with the relevant subject to speak with authority, and he or she must be familiar with the standard of care to which the defendant was held." (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467, 470 (*Avivi*) ["The test for determining familiarity with the standard of care is knowledge of similar conditions"].) "[The expert] must have had basic educational and professional training as a general foundation for his testimony, but it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining

9

competency of the expert to testify to the degree of care against which the treatment given is to be measured." (*Huffman v. Lindquist* (1951) 37 Cal.2d 465, 478.)

"[T]he qualification of an expert witness requires exercise of trial court discretion." (*Avivi, supra*, 159 Cal.App.4th at p. 472.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon, supra*, 55 Cal.4th at p. 773.)

### 3.    Summary Judgment

A trial court properly grants summary judgment " 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).)  A defendant may establish his right to summary judgment by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action.  ([§] 437c, subd. (p)(2).)" (*Neiman v. Leo A. Daly Co.* (2012) 210 Cal.App.4th 962, 967.)  "Once the moving defendant has satisfied its burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to each cause of action.  [Citation.]  A triable issue of material fact exists where 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Ibid.*)

On appeal, we apply an independent standard of review to determine whether a trial is required—whether the evidence favoring and opposing the summary judgment motion would support a reasonable trier of fact's determination in the plaintiff's favor on the cause of action or defense.  (*Aguilar v. Atlantic*

10

*Richfield Co.* (2001) 25 Cal.4th 826, 850.) In doing so we view the evidence in the light most favorable to the party opposing summary judgment. (*Id*. at p. 843; *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139.) We accept as true the facts shown by the evidence offered in opposition to summary judgment and the reasonable inferences that can be drawn from them. (*Spitzer v. The Good Guys, Inc*. (2000) 80 Cal.App.4th 1376, 1385-1386.)

## B.    Plaintiffs Established that Triable Issues Exist

Here, Dr. Badalian presented the declaration of Dr. Roth to the effect that Dr. Badalian complied with the applicable standard of care and, even had he not, his actions were not a substantial factor in causing Simon's death. This evidence carried his burden to show that the elements of breach and causation could not be established. The burden therefore shifted to plaintiffs to show that a triable issue of material fact existed as to breach and causation.

They did so. Dr. Shaw declared that blood loss complications from hip femur surgery are not uncommon and can be difficult to detect because the thigh tends to be large, with deep pockets of potential space between muscle and fatty tissue, able to contain a large amount of blood volume before it is clinically apparent with signs such as bruising. A cardiologist such as Dr. Badalian, who was familiar with the mechanism of the dual antiplatelet medications he prescribed, should have been aware of the risks. The standard of care in Simon's situation required serial hemoglobin monitoring in the postoperative setting. Yet Dr. Badalian failed to order such monitoring, which allowed Simon's blood loss to go undiagnosed until it was too late. Had Dr. Badalian monitored Simon's hemoglobin in a fashion

11

consistent with the standard of care, Dr. Shaw declared, Simon likely would have survived.

This evidence created a triable issue as to Dr. Badalian's breach of the standard of care and causation, and thus summary judgment was improper.

### 1. Dr. Shaw's Declaration Was Admissible

Dr. Badalian argues Dr. Shaw's declaration was inadmissible because he was not qualified to opine on the standard of care applicable either to Dr. Badalian "as a cardiologist" or to Simon's exact ailments.

Dr. Badalian fails to explain why a separate standard of care should be applied in this case either to Dr. Badalian as a cardiologist or to Simon's particular ailments. It is undisputed Simon died from complications arising from postoperative blood loss. The record contains no suggestion that expertise in cardiology is required to opine about monitoring postoperative blood loss.

It is true that Dr. Badalian is a cardiologist, but that does not mean that under the circumstances presented here, a cardiologist is held to a standard of care different from (and less than) any other physician about whom Dr. Shaw is qualified to opine. Nothing in the record supports that there is a separate standard of care for cardiologists or a separate standard specifically for monitoring blood loss.[1]

Therefore, Dr. Shaw's declaration was admissible.

---

[1] Dr. Badalian argues that plaintiffs allege he improperly cleared Simon for surgery "from a cardiac standpoint," and failed to order tests to assess Simon's "cardiac condition." But he identifies no such allegations, and we have discovered none.

The trial court's finding to the contrary constituted an abuse of discretion. The court found Dr. Shaw's declaration to be inadmissible because although Dr. Shaw had experience in caring for patients with advanced pulmonary diseases, heart transplantation, cardiogenic shock, extracorporeal membranous oxygenation, immunosuppression, massive trauma, and septic shock, there was no evidence that Simon's death was caused by any of these. That is true as far as it goes—Simon's death was caused by complications arising from undiagnosed blood loss. The record, however, does not support that a physician with experience in advanced pulmonary diseases, heart transplantation, cardiogenic shock, extracorporeal membranous oxygenation, immunosuppression, massive trauma, and septic shock cannot offer an opinion about testing required to detect blood loss.

Dr. Badalian complains that Dr. Shaw, who issued his report on March 15, 2021, did not review Dr. Roth's declaration, which was generated more than a year later to support summary judgment. No principle or precedent requires that an expert review another expert's opinion.

### 2. Dr. Shaw's Declaration Established a Triable Issue as to Breach of the Standard of Care

Dr. Badalian argues that even if Dr. Shaw's declaration was admissible, it failed to create a triable issue as to breach of the standard of care because: (1) In opining that Dr. Badalian allowed Simon's hemoglobin to drop below "what would be reasonable," Dr. Shaw failed to define the term "reasonable"; (2) Dr. Shaw failed to explain why laboratory tests would be required following orthopedic surgery where the patient does not

13

demonstrate any signs or symptoms of bleeding; and (3) Dr. Newman did not criticize Dr. Badalian.

We disagree.

Shaw used the word "reasonable" to designate a red flag, not a quantity. He did not need to define that quantity because he declared Simon's physicians would have recognized the red flag had they seen it.

Dr. Badalian incorrectly asserts that Dr. Shaw failed to explain why laboratory tests would be required following orthopedic surgery where the patient does not demonstrate any signs or symptoms of bleeding. On the contrary, Dr. Shaw declared that Dr. Badalian's failure to monitor Simon's hemoglobin caused physicians to be unaware that Simon was bleeding internally, which delayed and misdirected them, which led to Simon's death.

Finally, to the extent that Dr. Shaw disagreed with Drs. Roth and Newman about breach of the standard of care, the dispute can be resolved only by a trier of fact, not on summary judgment.

### 3. Dr. Shaw's Declaration Established a Triable Issue as to Causation

Dr. Badalian argues that even if Dr. Shaw's declaration was admissible, it failed to create a triable issue as to causation because: (1) Dr. Shaw failed to refute Dr. Roth's opinion that even if postoperative hemoglobin monitoring had been ordered, it more likely than not would have failed to predict the decedent's anemia, sudden myocardial infarction and associated symptoms; and (2) Dr. Newman contradicted Dr. Shaw's opinion that cardiac catheterization and heparin anticoagulation resulted in Simon's eventual death. We disagree.

14

The causation dispute between Drs. Roth and Shaw is mainly about the timing of the postoperative blood loss leading to Simon's heart attack. Plaintiffs theorize the bleeding was slow enough to have been revealed by serial hemoglobin monitoring, which would have led medical personnel to take remedial measures that would have saved Simon's life. Dr. Badalian contends the bleeding was too sudden to be discovered by serial monitoring until it was too late.

On this point, Dr. Roth declared that contrary to plaintiffs' theory, Simon did not experience extended postoperative bleeding because if he had, there would have been signs such as tachycardia and hypotension, which did not occur. Instead, Simon's myocardial infarction was caused by a sudden, acute event such as a ruptured ulcer or breach of a vessel. Roth declared that such an event would not result in a detectable drop in hemoglobin values, and thus would not have been discovered by serial monitoring before it was too late to remedy the loss of blood. Therefore, Roth concluded, serial monitoring would not have predicted Simon's sudden myocardial infarction, and consequently Dr. Badalian's failure to order monitoring did not contribute to Simon's death.

Dr. Shaw, however, declared that extended postoperative bleeding could occur following femur surgery with no clinical signs because thighs tend to be large, with deep pockets of potential space between muscle and fatty tissue, and are able to contain a large amount of blood volume before it is clinically apparent. Dr. Badalian's failure to monitor Simon's hemoglobin caused physicians to be unaware that Simon was bleeding internally, which delayed and misdirected them, and led to Simon's death.

Although Dr. Shaw did not directly refute Dr. Roth's opinion that extended blood loss would have resulted in tachycardia and hypotension, we must construe both declarations at the summary judgment stage in favor of plaintiffs. Essentially, Dr. Roth said Simon did not have clinical indications suggesting there was a problem that serial monitoring would have detected in time for intervention. Dr. Shaw opined that the reason one needs to do serial monitoring is that femur surgery can result in meaningful blood loss that will not present symptomatically, and that once the patient showed the symptoms on which Dr. Roth is focused it was too late. It is undisputed that by the time Dr. Badalian ordered a hemoglobin test, Simon's values had fallen from 12.6 to 6.8 grams per deciliter, but nothing in the record explains how fast this happened. For example, nothing indicates the drop was instantaneous. Although Dr. Roth declared the drop in Simon's hemoglobin values resulted from "sudden" and "acute" bleeding, he neither gave a time frame for that event nor explained why it could not have been discovered by serial hemoglobin tests.

A triable issue thus exists as to how fast Simon was bleeding and whether one or more of the hemoglobin tests in a serial regimen would have discovered the bleeding before the advent of tachycardia.

Finally, to the extent that Dr. Newman disagreed with Dr. Shaw on causation, the dispute can be resolved only by a trier of fact, not on summary judgment.

**DISPOSITION**

The judgment is reversed. Appellants are to recover their costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.